UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

PAMELA YOUNG,
Plaintiff

DECISION AND ORDER

-vs-

05-CV-6226 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,
Defendant.

---

APPEARANCES

For the Plaintiff: William J. McDonald, Jr., Esq.
Bond and McDonald, P.C.
91 Genesee Street
Geneva, New York 14456

For the Defendant: Brian McCarthy, Esq.
Assistant United States Attorney
Western District of New York
100 State Street
Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits. Now before the Court is defendant's motion for judgment on the pleadings [#4] and plaintiff's cross-motion [#6] for the same relief. For the reasons stated below, defendant's motion is denied, plaintiff's application is granted, and this matter is remanded for further administrative proceedings.

## PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits on October 16, 2002, claiming to be unable to work due to mental illness. (77, 83)[1] The Social Security Administration denied the application on January 3, 2003. (53) An administrative hearing was held on July 9, 2003, before an Administrative Law Judge ("ALJ"). The ALJ issued a Decision and Order on November 7, 2003, finding that plaintiff was not disabled. (13-19) Plaintiff sought review from the Appeals Council, which denied her request on April 28, 2005.[2] (4) Plaintiff commenced the instant action on May 6, 2005.

## FACTUAL BACKGROUND

At the time of the hearing in this matter, plaintiff was a 49-year-old female, with a high school education and additional training in cosmetology. (77) Plaintiff had worked as a hair dresser and school bus driver. After being hospitalized for mental health treatment for five days during August and September 2001, plaintiff returned to work. However, in June 2002, she stopped working as a bus driver because she was falling asleep and having difficulty concentrating and following directions. Plaintiff attributed her drowsiness and difficulty in concentrating to the anti-depressant and anti-psychotic medications that she was prescribed following her hospitalization in 2001. (32) Plaintiff continued to work part-time as a hairdresser, two-to-three days per week, until May 28, 2003, when she stopped working entirely.

[1] Unless otherwise indicated, citations are to the Administrative Record.

[2] Plaintiff submitted additional medical evidence to the Appeals Council on two occasions. The Appeals Council received and considered the first set of additional evidence, but apparently did not receive the second, as discussed further below.

MEDICAL EVIDENCE

On August 30, 2001, plaintiff was hospitalized at St. Joseph's Hospital in Elmira, New York, after she claimed she was having a nervous breakdown. Plaintiff, who was taking Prozac for depression, claimed to hear voices, and said she felt confused and tormented, as if someone was controlling her mind. (240) She also complained of decreased energy, indecisiveness, and a loss of interest in most things. On examination, psychiatrist Charles McGurk, M.D. ("McGurk") noted that plaintiff had poor eye contact, blunted affect, and "significant religious preoccupation and religious delusions as well as visual and auditory experiences which appeared to be hallucinations." (240) On the other hand, McGurk reported that she had good concentration and recall. In addition to Prozac, McGurk treated plaintiff with Trazodone and Seroquel. After five days, plaintiff's mood had improved significantly, and McGurk discharged her on September 5, 2001. Upon discharge, plaintiff was alert and cooperative, with full affect, and good eye contact. (241) Her thoughts were well directed, without any evidence of psychosis, and her insight and judgment were "fair to good." (241). McGurk recommended that plaintiff continue treatment with a clinical social worker and a psychiatrist.

On October 15, 2001, plaintiff was seen by her primary care physician, Randall Slimak, M.D. ("Slimak"). At that time, Slimak reported that plaintiff was feeling "much improved and intolerant [sic] of the medication except for fatigue. She is able to work however and has had no further adverse effect. She finds medication is controlling her depression and psychosis very well." (266) Plaintiff reported feeling "drowsiness, excessive sleepiness, lightheadedness and spacy feeling" as a result of the

medications, and so she stopped taking Trazodone and decreased her dosage of Seroquel. Plaintiff stated that, after discontinuing Trazodone, the drowsiness, excessive sleepiness and lightheadeness improved. However, the decreased dose of Seroquel was not as effective in controlling her psychosis, so she resumed taking the dosage originally prescribed by McGurk. Plaintiff reported having "some fatigue" from taking Seroquel, but was "able to cope well". (268) Slimak recorded "normal mood, memory, and affect, alert and o[riented] x3". (268)

On February 26, 2002, Slimak reported: "Currently doing very well. Experiences some fatigue but does not nod off asleep. Compliant with her medicine. Able to safely work. Sleeps well at night. Does not experience paranoid thoughts." (258) However, on March 31, 2002, Slimak noted that plaintiff was complaining of "panic attacks and poor sleeping. She had tremor on the Prozac. Seroquel was adjusted due to excessive somnolence but with the onset of panic spells she had increased the dose." (254) Plaintiff appeared "drowsy after taking Seroquel", and had "anxious mood". (256) Slimak prescribed Celexa for depression in place of Prozac.

On April 7, 2002, plaintiff requested an appointment with Slimak due to "recent anxiety and panic attacks." (250) Plaintiff apparently described the attacks as severe and debilitating. (*Id.*) Slimak recommended that plaintiff continue taking Celexa and Seroquel for depression, anxiety, and panic attacks, and also recommended that plaintiff follow up with a psychiatrist.

On April 16, 2002, plaintiff was seen by psychiatrist Michael Lavin, M.D. ("Lavin"), of the Guthrie Clinic at the Robert Packer Hospital in Sayre, Pennsylvania. Plaintiff told Lavin that her chief complaint was that her "mind was still not [working]

properly." (274) Plaintiff complained of "racing thoughts", and stated that she "experienced misunderstandings" when people talked to her. (274) Plaintiff also complained of anxiety, though she denied "panic episodes". Lavin recorded that plaintiff was alert and oriented, cooperative with good eye contact, "fair" mood, and "full range" affect. (276) Her GAF score was 58. Lavin recommended increasing plaintiff's Seroquel from 200 mg to 400 mg per day, and suggested that it might be necessary to decrease her dosage of Celexa. (278)

Plaintiff was seen again by Dr. Slimak on August 20, 2002, at which time she stated that she felt "much better" and was compliant with her medications. (298) Dr. McGurk saw plaintiff again on December 2, 2002, and noted that she was "doing fairly well." (270) Plaintiff told McGurk that she had lost her job as a school bus driver but was still working as a hairdresser. McGurk reported that,

> [t]he patient said that she has days in which she feels tired or 'spaced out' but usually is doing fairly well and not excessively drowsy during the day. She has occasional awakenings during the night and has, on occasion had a crying spell or two, but says that those have improved. . . . The patient is feeling that she is doing considerably better at this time although still having some difficulties.

(270) (emphasis added) Plaintiff was alert and cooperative, had good eye contact, euthymic mood, and normal speech. Her thinking was goal-directed, "without evidence of delusions or hallucinations, although she reports occasionally hearing a voice." (270) Her affect was "full and appropriate to content." Her insight and judgment were fair. Her GAF score was 55.

Plaintiff was examined by Brett Hartman, Psy.D. ("Hartman"), a non-treating, agency licensed psychologist, on December 17, 2002. (281) Plaintiff told Hartman that

she was working part-time, approximately 8 hours per week, as a hairdresser. Plaintiff reported that her sleep varied from one night to the next, and that she tended to wake during the night and then oversleep in the morning. She claimed to have a “severe” loss of energy since September 2001, possibly due to her medications, and a mildly decreased appetite. She also claimed to have poor concentration and memory, sadness, crying spells, and a loss of interest. She stated she felt “somewhat lost”, with decreased energy and poor motivation, though she was able to take care of housework, drive, and manage her own money. (284)

On examination, Hartman found plaintiff to have a “restricted, yet pleasant” affect, dysphoric mood, with coherent and goal-directed thinking. (283) Hartman stated that plaintiff appeared to have generally intact attention, concentration, and memory. Her cognitive functioning appeared “to be somewhat below the average range with a lower than average general fund of information.” (284) Her judgment and insight were fair. Hartman opined that plaintiff was

> able to follow and understand simple directions and instructions. She is also able to perform a variety of simple and rote tasks. It appears that she has fair attention and concentration at this time, and a fair ability to perform simple tasks on a consistent basis. She has a fair ability to learn new information. Claimant would appear to have mild difficulties performing complex tasks independently and a mild degree of difficulty relating adequately with others. She has a fair ability to make appropriate decisions at this time. She would seem to have some difficulty dealing appropriately with the normal stressors of life. Overall, these results appear to be partially consistent with the allegations of depression at this time.

(284-85) Hartman’s prognosis was, “fair, given her past higher level of functioning.” (285)

Plaintiff saw Dr. McGurk again on March 5, 2003. (304) Plaintiff reported doing

"fairly well", though she stated that the previous night she had awoken and felt like "something had taken her over". She reported feeling fatigued at certain times during the day, which she attributed to her medications. Plaintiff saw McGurk again on June 4, 2003, and again stated that she was doing fairly well, though she felt like she was "losing her mind sometimes." Plaintiff could not explain what she meant by that comment, except that she felt "somewhat drowsy" during the day and had trouble "staying focused". (303) She stated that her medication was helpful in controlling her anxiety. She denied having racing thoughts or hallucinations.

All of the foregoing medical evidence was before the ALJ. Subsequent to the issuance of the ALJ's decision on November 7, 2003, Anthony Nicotera, M.D. ("Nicotera"), of the Robert Packer Hospital in Sayre, Pennsylvania, wrote on November 12, 2003, stating: "Ms. Young remains under my care for treatment of her psychiatric disorder and currently is not capable of gainful employment." (305) Plaintiff submitted this statement to the Appeals Council, which considered it when denying review of the ALJ's decision.

## STANDARDS OF LAW

______42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of this five-step sequential analysis, the defendant may carry its burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which

claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

THE HEARING AND THE ALJ'S DECISION

At the hearing held on July 9, 2003, plaintiff appeared with a legal representative. When the ALJ asked plaintiff to describe her medical problems, she responded, "Short mind spans, forgetting, all I want to do is sleep from the medication I take." (32)

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

Plaintiff denied having any physical pain. Plaintiff stated that, after resigning her position as a bus driver on June 17, 2001, she continued to work as a hairdresser part-time, "Mondays and Fridays mostly, and Saturdays." (33) However, she said that she had difficulty working because she felt drowsy: "I was falling asleep during the day, so I wasn't working very much. And all I wanted to do was sleep." (33) Plaintiff testified that her drowsiness was a side-effect of the medications that she took. (40) Nonetheless, she continued to work as a hairdresser part-time, two or three days a week, until May 2003. (34) Plaintiff said that she had received about three unemployment checks from the State of New York. (37) When the ALJ asked her, "What's the main thing keeping you from working at the moment?", plaintiff replied, "I don't have a job." (38) When asked if she would take a job as a hairdresser if it was offered to her, plaintiff said yes, depending upon what the pay and benefits were. (38)

Plaintiff stated that she attended a religious school, the Institute of Divine Metaphysical Research[5] ("IDMR"), several times per week, and had traveled with IDMR groups to Los Angeles and New Orleans for classes. (44-46) Plaintiff stated that when she attended IDMR functions, she had no difficulty relating to people. (48)

Plaintiff was asked the following questions by her representative, and gave the following answers:

> Q. Well, what are some of the things that you used to do that you can't do anymore since this impairment started?
>
> A. Well, it's not that I can't. I just don't have the desire or the energy or

[5]According to this group's website, http://www.idmr.net/, "The Institute of Divine Metaphysical Research (IDMR) is a nonprofit, nondenominational, religious and scientific research organization," apparently based upon the teaching of one Dr. Henry Clifford Kinley, who claimed to have experienced "divine visions and revelations" in 1931.

> the drive to do the stuff. I know I – it needs [to be] done and I should do it, but I don't have the initial drive to carry through.
>
> Q. Well, would that be the same as if you had to work?
>
> A. Yes.

(48-49) Plaintiff also submitted an affidavit from her husband, in which he stated, *inter alia*, that plaintiff slept twelve to fourteen hours per day, was forgetful and unmotivated, and would fall asleep "any time any where." (187-88)

The ALJ issued his decision on November 7, 2003. (13-19) At the first step of the five-step sequential disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful employment since the alleged onset of her disabilty. The ALJ next found that plaintiff's depression was a severe impairment, which did not meet or medically equal any listed impairment. The ALJ next found that plaintiff's past jobs as a bus driver and hairdresser were light unskilled jobs (14), and that plaintiff retained the exertional ability to perform light work. However, the ALJ concluded that she had non-exertional impairments that reduced her ability to perform a full range of light work:

> Her capacity for light work is diminished by non-exertional limitations which prevent her from understanding, remembering and carrying out complex job instructions. Based upon the medical evidence of record concerning the claimant's depression, the [ALJ] concludes that the claimant has a slight restriction in ability to perform daily activities, a slight restriction in social functioning and moderate difficulties in maintaining concentration, persistence or pace as a result of mental impairments. There was one instance in August 2001, prior to her alleged onset date of disability that the claimant exhibited an episode of decompensation.

(16) Based upon this residual functional capacity ("RFC") finding, the ALJ found that plaintiff could not perform her past work as a bus driver, but could work as a cosmetologist/hairdresser. In that regard, the ALJ considered that plaintiff had

continued to work as a hairdresser even after the alleged disability onset date, and had also collected unemployment benefits, thereby representing to the State of New York that she was capable of working. (17) The ALJ also noted that none of her treating physicians had opined that she was completely unable to work. (17) Consequently, at the fourth step of the five-step sequential analysis, the ALJ found that plaintiff was not disabled.

ANALYSIS

Plaintiff contends that this case should be remanded for a new hearing for a variety of reasons, including that the Appeals Council failed to properly consider Nicotera's noted dated November 12, 2003, which post-dates the ALJ's decision. As discussed earlier, the note states, in its entirety: "Ms. Young remains under my care for treatment of her psychiatric disorder and currently is not capable of gainful employment." (305) The Secretary must weigh medical opinions generally in the manner set forth in 20 C.F.R. § 416.927(d). Moreover, as mentioned above, the Secretary must give controlling weight to a treating physician's opinion, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Here, the Appeals Council did not comply with 20 C.F.R. § 416.927(d), because it did not mention Nicotera's opinion.

Defendant, however, contends that Nicotera's statement is not material in any event, because it "post-dates the ALJ's November 7, 2003 decision by several months", and because it is unsupported. The Court disagrees with the first of these reasons, since the Appeals Council expressly stated that it "considered" Nicotera's November 7,

2003 statement. (4, 7) ("In looking at your case, we considered the reasons you disagree with the decision *and the additional evidence listed on the enclosed Order of Appeals Council*.") (emphasis added) According to the Commissioner's regulations, the Appeals Council would not have considered Nicotera's note unless it first determined that it "relate[d] to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). On the other hand, if the Appeals Council had felt that the evidence did "*not* relate to the period on or before the date of the administrative law judge hearing decision," it was required to return the evidence to the plaintiff, "with an explanation as to why it did not accept the additional evidence and [advising her] of [her] right to file a new application." 20 C.F.R. § 404.976(b) (emphasis added). Since the Appeals Council did not return the evidence, it apparently determined that the evidence related to the period on or before the ALJ's decision.[6] *See, e.g., Banks v. Apfel*, No. 98-4214-SAC, 2000 WL 1863382 at *11, n. 1 (D.Kan. Nov. 13, 2000) ("Because it did not follow the procedure at 29 C.F.R. § 404.976(b)(1), the Appeals Council presumably concluded these notes and all other records submitted to them related to the alleged disability period decided by the ALJ."); *Miller v. Barnhart*, No. 01 Civ.2744 DAB FM, 2004 WL 1304050 at *9 (S.D.N.Y. May 6, 2004) ("Since th[e] evidence involved treatment that began after the date of the ALJ's decision . . . the Appeals Council properly returned it to [the plaintiff] with the instruction that she could

---

[6]On remand, after developing the record, the parties may explore whether Nicotera's opinion in fact pertained to the period on or before the ALJ's decision. Additionally, plaintiff contends that another report by Nicotera, this one dated April 13, 2004, should be made a part of the record. Although plaintiff's representative claims to have sent the document to the Appeals Council, there is no indication that it was ever received or considered by the Appeals Council. To the extent that plaintiff asks this Court to make the document part of the record, the request is denied. However, plaintiff may submit this document to the ALJ for his consideration on remand.

file a new application.")

The Court also disagrees with defendant's contention that the November 7, 2003 report is immaterial because it is not supported "with any medical or clinical findings." (Def. Reply. p. 4) Remand for development of the record is necessary precisely because the statement is unsupported. *Schaal v. Apfel*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.") In that regard, pursuant to 20 C.F.R. § 404.1512(d), the Appeals Council, like an ALJ, has a duty to develop the record. *Sharbaugh v. Apfel*, No. 99-CV-277H, 2000 WL 575632 at *3 (W.D.N.Y. Mar. 20, 2000) ("[W]here the record before the Appeals Council is ambiguous or incomplete, the Appeals Council has an affirmative obligation to develop it further.") (citing *Boyd v. Apfel*, No. 97 CV 7273, 1999 WL 1129055 at *5 (E.D.N.Y. Oct. 15, 1999), other citations omitted). Nicotera's ambiguous note was the only evidence from him in the record before the Appeals Council, and the Court finds that the Appeals Council should have attempted to develop the record to determine the basis for his opinion, though its failure to do so may have been a mere oversight, since it mistakenly referred to Nicotera's statement as "prescription documentation".[7] (7)

Finally, the Court notes that, while plaintiff testified that she experiences excessive drowsiness during the day as a side-effect of her medications, the ALJ's decision did not address this evidence. Rather, the ALJ observed only that, "[Plaintiff] testified that in a typical eight hour day she goes to bed at 10:00 PM and awakes at

---

[7]Nicotera's statement was written on a prescription form. (305)

11:00 AM", without discussing how this might affect her ability to work. (16) On remand, if he has not already done so, the ALJ should consider the evidence concerning the side-effects of plaintiff's medications, and develop the record further if necessary. The ALJ should then discuss the weight that he has given to the evidence. *See*, 20 C.F.R. § 404.1529(c)(3)(iv) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;"); *De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 935 (2d Cir. 1984) ("The ALJ also made no mention of the testimony that [claimant] was experiencing significant side effects from using Tegretol.")

CONCLUSION

Defendant's motion for judgment on the pleadings [#4] is denied, plaintiff's cross-motion [#6] for the same relief is granted, and this matter is remanded, pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this Decision and Order.

So Ordered.

Dated: Rochester, New York
February 14, 2006

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge